UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

YOUNG HAN, individually, and              No. 2:10-cv-00633-MCE-GGH
as successor-in-interest to
Decedent JOSEPH HAN; NAM HAN;
DAVID HAN,

        Plaintiffs,

    v.                                   <u>MEMORANDUM AND ORDER</u>

CITY OF FOLSOM, a municipal
corporation, et al.,

        Defendants.

                ----oo0oo----


    Plaintiffs, survivors of Decedent, Joseph Han ("Decedent"),

seek redress for several federal and state law claims alleging

that the City of Folsom ("City"), the City's Chief of Police,

Samuel Spiegel ("Spiegel"), officers Paul Barber ("Officer

Barber"), Daren Prociw ("Officer Prociw") and Ron Peterson

("Sergeant Peterson") (collectively, "Defendants"), violated

Decedent's civil rights during the course of responding to a

domestic disturbance call at the home of the Decedent and

Plaintiffs, his immediate family.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, Defendants' motion is granted.

## BACKGROUND[1]

In April, 2009, Decedent began acting increasingly abnormal. (UF ¶1.)  For example, according to Decedent's father, he began refusing to eat or drink.  (Dep. of Young Han ["Young Dep."] at 13.) Moreover, Decedent's brother testified that when his parents or brother attempted to enter Decedent's bedroom, he would uncharacteristically shout at them to get out.  (Dep. of David Han ["David Dep."] at 32-35.)

///

---

[1] The facts are, for the most part, undisputed.  Where the facts are disputed, the Court recounts Plaintiffs' version of the facts as it must on a motion for summary judgment.  In that regard, the Court notes that, although not required by the court's local rules, Plaintiffs did not file a separate statement of "Disputed Facts," but rather only responded to Defendants' statement of undisputed facts, with citation to deposition testimony, which Plaintiffs argue raises material disputed issues of fact precluding summary judgment.  Thus, the Court, in recounting the relevant facts, refers to Defendants' separate statement of undisputed facts.  (See Defs.' Separate Stmt. Of Undisp. Material Fact ["UF"], filed Aug. 16, 2011, [ECF No. 11-1].)  However, where the facts are disputed, the Court refers to Plaintiffs' response to Defendants' statement of undisputed facts.  (Pl.'s Response to Def.'s Separate Stmt. of Undisp. Facts ["PRUF"], filed Sept. 16, 2011, [ECF No. 16-1].)

Moreover, the Court, when necessary, cites directly to the parties' deposition testimony.  Counsel for both parties lodged the relevant portions of the depositions referred to by the Court with their respective declarations.  (See Decl. of Bruce Praet, ["Praet Decl."], filed Aug 16, 2011, [ECF No. 11, Exs 1-5]; (Decl. Of Benjamin Nisenbaum ["Nisenbaum Decl."], filed Sept. 16, 2011, [ECF Nos. 17-18, Exs. A-O].)  The Court will refer to the depositions lodged with the respective declarations by deponent's name, as do the parties.

During one particularly disturbing occasion, Decedent approached his mother in the nude and attempted to kiss her in a fashion that "wasn't a mother[] and son type of kiss." (Id. at 27.) According to Plaintiffs, Decedent had been calling himself god.[2] (See Pl.'s Opp'n, filed Sept. 16, 2011, [ECF No. 16], at 6:15.)

On the morning of April 12, 2009, Decedent's mother asked a friend, Mrs. Saito, a registered nurse, to come to their home to speak with Decedent. (David Dep. at 33:16-34:3.) As Mrs. Saito attempted to calm Decedent down, Joseph began yelling at her and ordering her to get out of his room. (Id. at 3:1-36:1.) Left with no other options, the Han family asked Mrs. Saito to call 911 to tell them that they had a "5150"[3] situation at the Han residence. (UF ¶ 2.) David Han, hoping that the police could take his brother to the hospital, also called 911 and requested the police meet him down the street from the home. (David Dep. 54:10-17.) David testified that he called the police because he did not believe he would be able to convince his brother to get into the car and go to the hospital. (Id. at 64:10-23.)

When the officers arrived, they informed Plaintiffs that, based on the information at hand, and because Decedent was over 18, they could not take Decedent into custody in accordance with Section 5150 of the California Welfare and Institutions Code.

---

[2] The toxicology and alcohol reports from Decedent's autopsy show that no drugs or alcohol were in Decedent's system. (Nisenbaum Decl., Ex. D.)

[3] Cal. Welf. & Inst. Code § 5150 authorizes law enforcement and medical officials to detain an individual for up to 72 hours for psychiatric evaluation if the individual appears to be (1) a danger to himself or herself, (2) a danger to others, or (3) gravely disabled.

3

1  (UF ¶ 4.)  The officers explained to the Han family that they
2  were not permitted to take any action beyond talking to Joseph.
3  (UF ¶ 5.)  Upon hearing this, Plaintiffs asked the officers to
4  enter the residence to talk to Decedent in hopes that the
5  officers could calm Decedent down.  (UF ¶ 7.)  Specifically,
6  Decedent's brother, David Han, told the officers they could enter
7  the home "and talk to him and help out."  (David Dep. at 67:10-
8  25.)  Before entering the home, David Han warned the officers: "I
9  don't know how he's going to react.  He's kind of like sporadic,
10 and he's completely not himself." (Id. at 66:2-5.)  David Han
11 warned the officers that Decedent had a camping knife and that
12 they should "have [their] Tasers ready."  (Id. at 66:6-25.)

13       When Plaintiffs and the officers approached the home, they
14 discovered that the previously unlocked door had been locked from
15 the inside.  (UF ¶ 9.)  When the officers entered the residence,
16 accompanied by Decedent's family, David Han told the officers
17 that Decedent had last been seen in his upstairs bedroom.
18 (UF ¶ 11.)

19       Officer Barber took one step past the threshold of
20 Decedent's bedroom when he saw Decedent either sitting on, or
21 standing next to his couch, holding a knife in his hand.  (PRUF
22  ¶ 13.)  Officer Barber addressed Decedent by name and explained
23 that he was only there to talk to him and to ensure that he did
24 not harm himself.  (UF ¶ 14. )
25 ///
26 ///
27 ///
28 ///

1  Decedent began cursing and told Officer Barber that he did not
2  want to talk and demanded that Officer Barber get out of his
3  house.  (Dep. of Paul Barber [Barber Dep.] at 49:15-50:8.)
4  Officer Barber then said: "[w]ell, I'm here now.  Let's talk.
5  Just drop the knife.  I want to make sure you don't hurt
6  yourself."  (Id. at 50:7-50:11.)

7       At this point, Officer Barber had his Taser drawn and
8  pointed at Decedent's center mass.  (Id. at 50:3-6.)  Decedent
9  pointed the tip of the blade at Officer Barber and told him, "Get
10 the fuck out of my room, or I'm going to cut your throat and
11 shove it down your neck."  (Id. at 51:4-7.)   Officer Barber then
12 told Decedent to drop the knife, or he was going to Taser him.
13 (Id. at 59:24-60:1.)  As soon as Officer Barber drew his Taser,
14 Officer Prociw did the same.  (Dep. of Daren Prociw ["Prociw
15 Dep."] at 86:16-17.)  According to Officer Barber, he deployed
16 his Taser[4] center mass as Decedent began bending forward, as if
17 to stand up.  (Barber Depo 60:2-6.)
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25

26      [4] "The stun gun or 'Taser' is a non-lethal device commonly
   used to subdue individuals resisting arrest.  It sends an
   electric pulse through the body of the victim causing
27 immobilization, disorientation, loss of balance and weakness.  It
   leaves few, if any, marks on the body of the victim."  Matta-
28 Ballesteros v. Henman, 896 F.2d 255, 256 n.2 (7th Cir. 1990).

1   The Taser, however, failed to subdue Decedent.[5]  (Id. at
2   60:12-15.)  After Barber tased him, Decedent, holding the knife
3   at chest level, responded: "You can't stop me, you can't Taser
4   me," or "something to that effect."[6]  (Id. at 61:1-5; UF ¶ 18)
5   Officer Barber asked Decedent two more times to put the knife
6   down.  (Dep. of Ronald Peterson, ["Peterson Dep."] at 37:25-
7   38:1.)  Officer Barber drew his firearm, stepped into the
8   bedroom, and took another step in so that he "could get a better
9   shot on him."  (See Nisenbaum Decl., Ex. B at 221:17-22.)
10  Decedent then advanced to within six feet of Officer Barber.[7] (UF
11  ¶ 20.)
12  ///
13  ///
14  ///
15

16      [5] According to Officer Barber, only one prong of the Taser
    contacted Decedent's skin.  (Barber Depo at 60:12-15.)
17

18      [6] Plaintiffs dispute UF ¶ 18 because, in his statement
    shortly after the incident, Officer Barber told investigators: he
    was "[a]ngry, yelling at me and that's when I deployed the Taser.
19  Right as he was standing up.  And then, as it hit him he still,
    he stood up.  And, basically, just looked at me like, 'you're
20  not, you can't touch me.'"  (See Nisenbaum Decl., Ex. B at
    221:17-22.)  The Court acknowledges that the exact words Decedent
21  said at this time are disputed.  Indeed, Officer Barber stated
    that the words were "something to the effect."  However, the
22  Court finds the distinction between the two statements
    meaningless in the context of this motion — both statements
23  establish that the Taser was ineffective and that Decedent
    continued to demonstrate his intent to be combative with the
24  officers.

25      [7] Plaintiffs contend that the deposition testimony of
    Peterson and Prociw contradict Officer Barber's testimony in this
26  regard.  However, a thorough reading of the deposition testimony
    reveals that neither Peterson nor Prociw stated that Decedent did
27  not approach to within six feet of Barber, they merely state that
    they did not see if Decedent was moving when Officer Barber
28  discharged his firearm.

6

1    According to Officer Prociw, he then heard Officer Barber

2  ask for another Taser and deployed his Taser at Decedent.

3  (Prociw Dep. at 94:23-95:16.)  Officer Prociw did not see the

4  reaction that he would expect from a person receiving an electric

5  shock from a Taser.  (Id. at 96:6-10.)  After Officer Prociw

6  tased him, Decedent maintained his ground, holding the knife

7  "just below the belly button on the waist, kind of still[,] the

8  blade pointing forward."  (Id. at 99:11-15.)  Officer Barber then

9  fired a single shot from his firearm.[8]  (UF ¶ 20.) Prociw,

10 however, did not see Decedent react in any way that would be

11 attributed to a gunshot.  (Prociw Depo at 100:18-20.)

12   Officer Barber then exited the room and entered the bathroom

13 with Decedent's brother.  (Barber Dep. at 61:25-62:11.)  Decedent

14 then shut the door.  (Nisenbaum Decl., Ex. B at 223:25-224:18.)

15 Sergeant Peterson, however, did not see Officer Barber exit the

16 room.  (UF ¶ 22.)  Believing that Officer Barber was trapped in

17 the room with Decedent, Sergeant Peterson kicked open the bedroom

18 door and entered with his gun drawn.  (Peterson Dep. at 41:20-

19 24;UF ¶ 23.)  As Sergeant Peterson entered, Decedent was in front

20 of the couch, still standing.  (Id. at 42:7-12.)

21 ///

22

23   [8] The chronological order of the second Taser and the
   gunshot is unclear.  According to the deposition of Officer
24 Prociw and Defendants statement of undisputed fact —— which
   Plaintiffs do not dispute —— Officer Prociw deployed the second
25 Taser, which was ineffective, then Officer Barber fired his gun.
   However, Officer Barber, in his deposition testimony, stated that
26 he asked Prociw to fire the Taser at Decedent after he discharged
   his firearm at Decedent.  (Barber Depo at 17-24.)  Plaintiffs, in
27 their opposition, recount both sides of the story.  The specific
   chronological order of the second Taser and the gun shot is
28 irrelevant to the Court's analysis.

Sergeant Peterson does not recall whether Decedent was still holding the knife at this juncture.  (<u>Id.</u> at 43:5-6.)

Officer Prociw, at the request of Sergeant Peterson, deployed another Taser.  (UF ¶ 25.)  At first, Sergeant Peterson believed that the third Taser was effective because he "went down on the couch"; however, when officer Peterson approached Decedent to take him back into custody, Decedent "just stood back up." (Peterson Depo at 43:14-25.)  When he stood up, Sergeant Peterson saw that Decedent still had the knife in his hand.  (<u>Id.</u> at 44:7-10.)  After ordering Decedent to drop the knife twice to no avail, Sergeant Peterson began backing up toward the door.  (<u>Id.</u> at 44:11-45:4.)  Decedent then slowly, but deliberately, advanced toward Sergeant Peterson, refusing to drop the knife. (<u>Id.</u> at 45:45:4-7.)  At this point, Sergeant Peterson, aiming for Decedent's hip, discharged his revolver at Decedent.  (<u>Id.</u> at 48:13-18.)  According to Sergeant Peterson, although contrary to standard operating procedure, he aimed for his hip "[b]ecause [he] just wanted him to go down. [He] wanted to take control of the situation. [He] wasn't looking to kill."  (<u>Id.</u> at 48:18:22.)

After this second shot, Decedent began falling slowly toward the ground, still grasping the knife in his hand.  (<u>Id.</u> at 49:12-22.)  Decedent stumbled towards the doorway, eventually falling into Sergeant Peterson, causing the two of them to fall to the ground.  (<u>Id.</u> at 50:3-12.)  Sergeant Peterson ordered the other officer to procure possession of the knife.  (<u>Id.</u> at 51:4-8.) The officers stepped on Decedent's wrist and pinned the knife down on the ground, thereby obtaining custody of the knife.  (<u>Id.</u> at 52:7-12.)

1  Decedent then freed his right hand and punched Sergeant Peterson
2  in the mouth.  (Id. at 52:13-18.)  The officers finally
3  handcuffed Decedent.  (Id. at 26:24-57:2.)

4     Within approximately one minute of the officers handcuffing
5  Decedent, Folsom medics and fire department arrived to administer
6  medical care.  (Id. at 607:12.)  Decedent later died at the
7  hospital.  (David Dep. at 106:13-14.)

8     Based upon these facts, Plaintiffs have brought claims
9  against the City of Folsom, the Folsom Chief of Police and the
10 individual officers under 42 U.S.C. § 1983 for failure to train
11 and/or supervise, illegal search and seizure[9] and use of
12 excessive force in violation of the Fourth Amendment.  Plaintiffs
13 also allege corollary state law claims for negligent infliction
14 of emotional distress, violation of California Civil Code § 52.1,
15 wrongful death and negligent hiring.

16
17                          **STANDARD**
18
19     Summary judgment is appropriate when it is demonstrated that
20 there exists no genuine issue as to any material fact, and that
21 the moving party is entitled to judgment as a matter of law.
22 Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144,
23 157 (1970).

24  _____

25     [9] Plaintiffs do not address whatsoever Defendants' arguments
   that there was no unreasonable search in violation of the Fourth
26 Amendment.  Indeed, it is clear that there was no such violation
   here as the home entry falls under a number of the exceptions to
27 the warrant requirement: consent, emergency, special needs and
   protective sweep.  Since Plaintiffs have no legitimate basis for
28 asserting a claim for illegal search and seizure, it is
   appropriate to grant Defendants' motion as to that claim.

1    Under summary judgment practice, the moving party
2    always bears the initial responsibility of informing
     the district court of the basis of its motion, and
3    identifying those portions of "the pleadings,
     depositions, answers to interrogatories, and admissions
4    on file together with the affidavits, if any," which it
     believes demonstrate the absence of a genuine issue of
5    material fact.

6  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

7  nonmoving party will bear the burden of proof at trial on a

8  dispositive issue, a summary judgment motion may properly be made

9  in reliance solely on the 'pleadings, depositions, answers to

10  interrogatories, and admissions on file.'"   Id. at 324.  Indeed,

11  summary judgment should be entered against a party who fails to

12  make a showing sufficient to establish the existence of an

13  element essential to that party's case, and on which that party

14  will bear the burden of proof at trial.  Id. at 322.  In such a

15  circumstance, summary judgment should be granted, "so long as

16  whatever is before the district court demonstrates that the

17  standard for entry of summary judgment, as set forth in

18  Rule 56(c), is satisfied."  Id. at 323.

19       If the moving party meets its initial responsibility, the

20  burden then shifts to the opposing party to establish that a

21  genuine issue as to any material fact actually does exist.

22  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

23  585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

24  253, 288-289 (1968).

25  ///

26  ///

27  ///

28  ///

1   In attempting to establish the existence of this factual dispute,
2   the opposing party may not rely upon the denials of its
3   pleadings, but is required to tender evidence of specific facts
4   in the form of affidavits, and/or admissible discovery material,
5   in support of its contention that the dispute exists.  Fed. R.
6   Civ. P. 56(c).  The opposing party must demonstrate that the fact
7   in contention is material, i.e., a fact that might affect the
8   outcome of the suit under the governing law, Anderson v. Liberty
9   Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is
10  genuine, i.e., the evidence is such that a reasonable jury could
11  return a verdict for the nonmoving party, Id. at 251-52.

12      In the endeavor to establish the existence of a factual
13  dispute, the opposing party need not establish a material issue
14  of fact conclusively in its favor.  It is sufficient that "the
15  claimed factual dispute be shown to require a jury or judge to
16  resolve the parties' differing versions of the truth at trial."
17  First Nat'l Bank, 391 U.S. at 289.  Thus, the "purpose of summary
18  judgment is to 'pierce the pleadings and to assess the proof in
19  order to see whether there is a genuine need for trial.'"
20  Matsushita, 475 U.S. at 587 (quoting Rule 56(e) advisory
21  committee's note on 1963 amendments).

22      In resolving the summary judgment motion, the court examines
23  the pleadings, depositions, answers to interrogatories, and
24  admissions on file, together with the affidavits, if any.
25  Rule 56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06
26  (9th Cir. 1982).

27  ///

28  ///

11

1   The evidence of the opposing party is to be believed, and all
2   reasonable inferences that may be drawn from the facts placed
3   before the court must be drawn in favor of the opposing party.
4   Anderson, 477 U.S. at 255.  Nevertheless, inferences are not
5   drawn out of the air, and it is the opposing party's obligation
6   to produce a factual predicate from which the inference may be
7   drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,
8   1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

9        Finally, to demonstrate a genuine issue, the opposing party
10  "must do more than simply show that there is some metaphysical
11  doubt as to the material facts....Where the record taken as a
12  whole could not lead a rational trier of fact to find for the
13  nonmoving party, there is no 'genuine issue for trial.'"
14  Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

15
16                            **ANALYSIS**
17  **A.    Excessive Force**
18
19       Defendants contend that their use of force was objectively
20  reasonable because they were faced, in close-quarters, with an
21  aggressive, mentally unstable individual that was overtly and
22  aggressively threatening the officers while brandishing a knife.
23  This factor is compounded, Defendants maintain, by the fact that
24  the only reason they were in the room in the first place was to
25  help calm Decedent down at the request of the Plaintiffs bringing
26  this claim.
27  ///
28  ///

1  Moreover, Defendants assert that their actions were objectively

2  reasonable because they only resorted to deadly force after being

3  threatened with a brandished weapon and attempting to subdue

4  Decedent with non-lethal force.  In sum, Defendants argue that no

5  reasonable juror would find that officers responding to a request

6  by Decedent's family, who in the face of an overt threat, attempt

7  to subdue an aggressive, mentally unbalanced individual with non-

8  lehtal force, and only resorted to lethal force when faced with a

9  direct threat, acted unreasonably.

10      Plaintiffs counter that the intrusion on Decedent's Fourth

11  Amendment interests —— specifically, Defendants' use of force to

12  subdue Decedent —— outweighs the government's interest in this

13  case.  Moreover, Plaintiffs contend that determining the amount

14  of threat posed by Decedent "requires a careful sorting of

15  material questions of fact and credibility determinations," and

16  thus, summary judgment is not appropriate in this instance.[10]

17  (Pl.'s Opp'n at 25:8-10.)  Specifically, Plaintiffs maintain that

18  Decedent made no threat to any person until after the officer

19  confronted him in his own bedroom, and thus, it was unreasonable

20  for the officers to use force upon him after he did threaten

21  them.  Moreover, Plaintiffs assert that, after Decedent

22  threatened the officers, they should have redeployed to outside

23  of the bedroom.  This is especially true, Plaintiffs argue,

24  because the officers knew that they were dealing with a mentally

25  disturbed individual.

26

27      [10] Plaintiffs commit 23 of 33 pages of background before
    actually reaching the legal questions at issue in this motion for
28  summary judgment.  (See generally Pl.'s Opp'n, filed Sept. 16,
    2011, [ECF No. 16].)

13

1    Any claim that law enforcement used excessive force, either
2   deadly or non-deadly, in the course of any confrontation with a
3   citizen, must be analyzed under the Fourth Amendment and its
4   standard of objective reasonableness.  See Graham v. Connor,
5   490 U.S. 386, 395 (1989); Drummond v. City of Anaheim, 343 F.3d
6   1052, 1056 (9th Cir. 2003).  The crucial inquiry in excessive
7   force cases is whether the use of force was "objectively
8   reasonable in light of the facts and circumstances confronting
9   [the officers], without regard to their underlying intent or
10  motivation."  Graham, 490 U.S. at 397; Blankenhorn v. City of
11  Orange, 485 F.3d 463, 477 (9th Cir. 2007).

12    Calculating whether a particular use of force was reasonable
13  "requires a careful balancing of the nature and quality of the
14  intrusion on the individual's Fourth Amendment interests against
15  the countervailing government interests at stake."  Graham,
16  490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis v. City of
17  Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  The court must
18  "first assess the quantum of force used to arrest [the
19  Plaintiff]," then "measure the governmental interests at stake by
20  evaluating a range of factors."  Davis, 478 F.3d at 1054.
21  Factors evaluated in determining the government interests at
22  stake include, but are not limited to, "the severity of the crime
23  at issue, whether the suspect poses an immediate threat to the
24  safety of the officers or others, and whether he is actively
25  resisting arrest or attempting to evade arrest by flight."
26  Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis, 478
27  F.3d at 1054.
28  ///

14

1    Moreover, where it is or should be apparent that an
2    individual is emotionally or mentally unstable, that is a factor
3    that must be considered in determining the reasonableness of the
4    force employed.  See Drummond, 343 F.3d at 1058; see also Smith
5    v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) ("In some
6    cases ..., the availability of alternative methods of capturing
7    or subduing a suspect may be a factor to consider.").  However,
8    the Ninth Circuit has not "adopt[ed] a per se rule establishing
9    two different classifications of suspects: mentally disabled
10   persons and serous criminals." Deorle v. Rutherford, 272 F.3d
11   1272, 1283 (9th Cir. 2001).  Importantly, reasonableness "must be
12   judged from the perspective of a reasonable officer on the scene,
13   rather than with the 20/20 vision of hindsight." Graham, 490 U.S.
14   at 396; Drummond, 343 F.3d at 1058.  "The calculus of
15   reasonableness must embody allowance for the fact that police
16   officers are often forced to make split-second judgments—in
17   circumstances that are tense, uncertain, and rapidly
18   evolving—about the amount of force that is necessary in a
19   particular situation." Graham, 490 U.S. at 396–97; Drummond,
20   343 F.3d at 1058.  Thus, "[a] reasonable use of deadly force
21   encompasses a range of conduct, and the availability of less
22   intrusive alternatives will not render conduct unreasonable."
23   Wilkinson v. Torres, 610 F.3d 546, 551 (9th Cir. 2010).

24       The overall reasonableness calculus, however, is not limited
25   to these factors.  "Rather, we examine the totality of the
26   circumstances and consider 'whatever specific factors may be
27   appropriate in a particular case, whether or not listed in
28   Graham.'"

15

1  Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (quoting

2  Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 19974)).

3  Therefore, the court, in analyzing the aforementioned factors,

4  will consider other, more specific factual nuances involved in

5  the particular situation that unfolded on April 12, 2009.

6  Ultimately, however, the most salient factor is "whether the

7  suspect poses an immediate threat to the safety of the officers

8  or others." Smith, 394 F.3d at 702.

9      First, the court must calculate the quantum of force

10 employed by the officers.  In this case, it is undisputed that

11 the officers, by the end of the confrontation, resorted to deadly

12 force.  However, "the reasonableness of a particular application

13 of force, [can]not to be considered in a vacuum." Id. at 701.

14 In this case, the use of deadly force is mitigated by the fact

15 that the officers, after Decedent threatened cutting their throat

16 and shoving it down their neck, attempted to subdue Decedent by

17 deploying two Tasers,[11] "a medium or intermediate level of

18 force." Sanders v. City of Fresno, 551 F. Supp. 2d 1149, 1170

19 (E.D. Cal. 2008) Aff'd 340 Fed. Appx. 377 (9th Cir. 2009).  As

20 set forth above, Officer Barber did not resort to using his

21 handgun until it was clear that the use of the Taser had no

22 effect on Decedent, and Decedent continued to threaten Officer

23 Barber.  Moreover, Sergeant Peterson did not fire his weapon

24 until after a third Taser failed to subdue Decedent, and Decedent

25 again stood up with the knife and approached the officers.

26 ///

27

28    [11] As set forth above, it is chronologically unclear whether
   both Tasers were fired before the first shot, or the second Taser
   was fired after the first shot.

1    In a case that is factually similar, this Court held that
2 officers who deployed five Tasers,[12] and continuously cycled
3 those Tasers in drive-stun mode —— the Taser setting which "is
4 considered last resort and should rarely be used" —— acted
5 objectively reasonable because the Taser failed to subdue the
6 resisting victim.  See generally id.  The officers in Sanders,
7 similar to the officers in this case, faced a obviously unstable,
8 violent individual who refused to subdue to the officers' use of
9 non-deadly force.  Id. at 1164.  In this case, the officers
10 discharged their firearms only after the Tasers failed and
11 Decedent continued to approach them; in Sanders the officers
12 continued to tase Decedent and cycle drive-stun electric shocks
13 because the previous Tasers were uneffective.  In both cases, the
14 recipient of the force passed away.  Nevertheless, the Court, as
15 did the Sanders court, finds that the quantum of force used was
16 objectively reasonable, in part because the previous use of non-
17 deadly force failed to subdue a mentally unstable, violent
18 assailant.[13]

19    Moreover, in this case, Plaintiffs' own expert testified
20 that each Taser deployment, as well as the discharge of Officer
21 Barber and Sergeant Peterson's firearms, were objectively
22 reasonable.  Specifically, during his deposition testimony,
23 Plaintiffs' expert testified as follows:
24 ///

25

26    [12] The combined use of the Tasers and Decedent's use of
cocaine combined to kill Decedent.  Id. at 1162.

27    [13] The Ninth Circuit has affirmed this Court's holding in
28 Sanders.  See Sanders v. City of Fresno, 340 Fed. Appx. 377 (9th
Cir. 2009).

17

1  Q:   Any problem with Officer Barber deploying the
Taser at the point that he did the first time.
2

3  A:   No.

4  Q:   And it was proper for Officer Prociw to deploy the
Taser when he did?
5

6  A:   Yes, subject to all the other failures on how to
deal with emotionally disturbed persons, yes.  When
you're faced with a knife at that point, it is a
reasonable tool to attempt to use.
7

8  Q:   And that second deployment, the one by Officer
Prociw at that point, also fails to gain the desired
effect of disabling Joseph, correct?
9

10  A:   Yes.

11  Q:   In fact, after the two Taser applications, Joseph
continues to advance towards Officer Barber with the
knife brandished, didn't he?
12

13  A:   He did.

14  Q:   And at that point was it reasonable for Officer
Barber to deploy deadly force?
15

16  A:   Yes, to stop the immediate threat.

17  Q:   Was it reasonable for Sergeant Peterson to call
for a Taser at that point?
18

19  A:   Yes.

20  Q:   Officer Prociw deploys what is now going to be his
second Taser cartridge at this point, right?
21

22  A:   Correct.

23  Q:   That will be, I guess, the third Taser discharge,
correct?
24

25  A:   Yes.

26  Q:   Was it proper for Sergeant Peterson during the
effect of the Taser to attempt to move in and try to
secure Joseph?
27

28  A:   That is what you do, yes.

Q:   But at some point during the third Taser
application, Joseph stood up with a knife still in his
hand in front of Sergeant Peterson, right?

18

1    A:   It appears that way, yes.

2    Q:   And at that point Sergeant Peterson fired a single
     shot from his weapon, didn't he?

3

4    A:   He did.

5    Q:   Was that reasonable for him to do that?

6    A:   He indicated he felt a direct imminent threat,
     yes.  Use of deadly force would have been warranted.

7    (Deposition of Lou Reiter, filed Sept. 23, 2011, [ECF No. 21,

8    Ex. 1] at 72-80)  Based on the foregoing, the court finds that,

9    although the officers ultimately resorted to deadly force, the

10   quantum of force employed was reasonable under the specific

11   circumstances at hand.

12        Next, the court must balance the alleged intrusion upon

13   Decedent's Fourth Amendment rights with the government's interest

14   by balancing the Graham factors.  First, the court begins with

15   "the most important single element" in the reasonableness

16   calculus under Graham —— whether Decedent posed an immediate

17   threat to the safety of the officers or the safety of others.

18   Smith, 394 F.3d at 702.

19        In this case, the Court finds that the evidence conclusively

20   demonstrates that Decedent posed an immediate threat to the

21   officers, Decedent's family and himself.  Indeed, as set forth

22   above, Plaintiffs' expert expressly stated that Decedent posed an

23   "immediate threat."  (See Dep. of Lou Reiter at 74:14-16.)  These

24   officers were faced with a violent, mentally unstable individual

25   who was brandishing a weapon and overtly threatening the officers

26   that he would cut their throats and shove it down their neck.

27   Moreover, Decedent refused to permit the officers to speak with

28   them and told them that a Taser would not stop him.

                                   19

1   Finally, the fact that Decedent managed to strike Sergeant

2   Peterson's face with his fist after being shot twice and tased

3   three times is demonstrative of Decedent's determined intent to

4   harm the officers.  Were the officers to, as Plaintiffs suggest,

5   simply leave Decedent alone in his bedroom in his mentally

6   unstable state, in possession of a knife, Decedent could have

7   easily harmed either himself or a member of his family.  Based on

8   the facts set forth above, the Court finds the Decedent posed a

9   significant, immediate threat to the officers, himself and his

10  family.

11      Moreover, the Court finds that the second <u>Graham</u> factor

12  weights in Defendants' favor: the underlying offenses committed

13  by Decedent —— assault on an officer and assault with a deadly

14  weapon[14] —— are, at the very least, borderline serious offenses.

15  This factor, however, is mitigated by the third <u>Graham</u> factor:

16  there is no evidence that Decedent attempted to evade arrest by

17  fleeing.  While Defendants could argue that Decedent attempted to

18  avoid arrest, there is no evidence that the officers actually

19  were attempting to arrest Decedent.  Indeed, the officers

20  initially stated that they could not detain Decedent as a 5150

21  and only entered the room to speak with Decedent at the request

22  of his family.  The officers only attempted to subdue Decedent

23  after he brandished the weapon.

24  ///

25  ///

26  ///

27

28      [14] Cal. Penal. Code §§ 243, 245.

20

1   Nevertheless, the Court finds that, based on the immediacy of the
2   threat imposed by Decedent, and the serious nature of the crimes
3   committed by Decedent, the <u>Graham</u> factors, as a whole, militate
4   in favor of a finding that the officers' use of force was
5   objectively reasonable.

6        Finally, the Court considers other factors unique to the
7   specific events that unfolded on April 12, 2011.  <u>See</u> <u>Bryan</u>, 630
8   F.3d at 826.  Here, the circumstances that led the officers to
9   enter Decedent's room in the first place militate in favor of a
10  finding that the officers acted reasonably.  Specifically, the
11  officers only entered the home and Decedent's bedroom at the
12  express request of Decedent's family to speak with him in an
13  attempt to calm him down.  It was not until Decedent assaulted
14  the officers with a brandished weapon that the situation
15  escalated from an attempt to help the young man to a volatile
16  confrontation requiring the use of force.

17       In conclusion, based on the aforementioned factors, the
18  Court finds that, as a matter of law, the officers' use of force
19  was objectively reasonable under the circumstances.  Thus,
20  Plaintiffs' claim that Defendants' use of force was unreasonable
21  rests on their argument that the use of force was excessive
22  because the officers failed to take into account Decedent's
23  mental condition.  However, Plaintiffs' contention that
24  Decedent's mental instability, in-and-of-itself, is sufficient to
25  nudge the officers' use of force from reasonable to unreasonable,
26  is unavailing.

27  ///

28  ///

21

1    While the mental state of the victim is a factor to be

2  considered in determining the reasonableness of the use of police

3  force, it is far from dispositive.  The Ninth Circuit, in

4  delineating that principle, took care to note that there are no

5  separate categories for mentally ill victims and those of sane

6  mind.  Instead, the mental stability of a recipient of police

7  force must be accounted for in the reasonableness calculus,

8  considering the totality of the circumstances.  Indeed, while the

9  court is required to account for a suspect's mental impairment,

10  there is analogous precedent holding that a suspect's unstable

11  and/or violent mental state actually militates in favor a finding

12  that the use of force is reasonable.

13    For example, in Sanders, as was the case here, "the officers

14  were in the process of investigating a 5150 call."  Sanders,

15  551 F. Supp. 2d at 1168.  The officers were responding to a "call

16  in which it was reported that a female was crying and a man was

17  'tearing up' the home."  Id.  When the officers arrived, the

18  suspect was in an "agitated and paranoid state of mind."  Id. at

19  1170.  After the suspect grabbed the woman and fell back into the

20  home, the officers tased him five times and continuously cycled

21  the Taser until he ultimately stopped; the suspect later died at

22  the hospital.  Id. at 1157-1163.  The court held that, because of

23  the suspect's agitated state, and the "rapidly devolving

24  situation," the multiple drive-stun Taser applications were not

25  unreasonable, even though they contributed to his death.  Id. at

26  1170-1176.

27  ///

28  ///

1    Similarly, in <u>Blanford v. Sacramento Cnty.</u>, 406 F.3d 1110

2  (9th Cir. 2005), a man wearing a ski mask and carrying a sword

3  was walking through a residential neighborhood.  <u>Id.</u> at 1112.

4  The officers ordered the suspect to drop the sword as he

5  attempted to open the door of a residence.[15]  <u>Id.</u> at 1113.  When

6  the suspect did not drop the sword, the officers fired numerous

7  gun shots at the suspect, one shot hit his spine, rendering him a

8  paraplegic.  <u>Id.</u> at 113-114.  The court, in holding that the

9  officers' conduct was objectively reasonable, took into account

10 the fact that the officers "considered the possibility that

11 Blanford might be mentally disturbed or under the influence of a

12 controlled substance."  <u>Id.</u> at 1116.

13    As in <u>Blanford</u> and <u>Sanders</u>, the police in this case were

14 faced with a mentally unstable, potentially violent and

15 threatening individual.  In both cases, and in this case,

16 Decedent's violent and impaired state of mind actually weigh in

17 favor of a finding that the officers' conduct was reasonable.

18 Specifically, these officers, in close-quarters, with a clearly

19 enraged individual, took the cautious approach of deploying three

20 <u>non</u>-lethal Tasers.  Only when it was evident that non-lethal

21 force would not suffice to disarm Decedent, and Decedent advanced

22 on the officers brandishing a knife, did the officers resort to

23 discharging their firearms.  Given the circumstances that took

24 place in Decedent's bedroom, it was impossible for those officers

25 to know what Decedent might do.

26 ///

27

28    [15] Unbeknownst to the officers, that residence turned out to be his own.

23

To this end, in order to protect themselves, and to obtain custody of the weapon for purposes of ensuring Decedent did not harm himself or others, it was prudent of the officers to deploy the force they did.

It is easy to retrospectively suggest that these officers should have taken a different approach to the situation. However, police officers are not required to "find and choose the least intrusive alternative" as that would "require them to exercise superhuman judgment[,] [i]n the heat of battle with lives potentially on balance." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). Moreover, officers are not required to have the perfect vision of 20/20 hindsight. Graham, 490 U.S. at 396. In this case, the Court finds the alternative suggested by Plaintiffs would have been wholly untenable. Specifically, had the officers, as Plaintiffs suggest, merely left the room and, presumably, the home, they would have left a deranged, clearly violent individual in possession of a deadly weapon with the opportunity to harm not only himself, but also the family members still in the home. Indeed, when asked why he did not exit from the room when Decedent pointed the knife at him, Officer Barber responded: "Protecting my life is what stopped me, protecting the life of my fellow officers to my right, and the family that's downstairs." (Barber Dep. at 55:5-14.) Moreover, taking Plaintiffs' proffered course of action would have undermined the very purpose for the officers' legal entry into Decedent's room in the first place — Decedent's family specifically requested the officers to enter the room to attempt to speak with Decedent in order to calm him down.

24

1    Under these circumstances, it is prudent to ask: had the

2  officers taken Plaintiffs' suggested course of action, and left

3  Decedent alone in the home, and Decedent then caused serious harm

4  to either himself or another member of the family, would the

5  officers and the City not be subject to a similar suit for, at

6  the very least, negligence? Gross negligence? Negligent or

7  Intentional infliction of emotional distress? Deliberate

8  indifference to a known risk?  The law does not require police

9  officers, in the heat of an ever-escalating situation, as was the

10  case here, to make these kinds of split-second decisions.

11    Based on the foregoing, the Court finds that no reasonable

12  juror could find that, based on the totality of the

13  circumstances, the officers' use of force was objectively

14  unreasonable. Matsushita, 475 U.S. at 586-87   Thus, Defendants'

15  motion for summary judgment as to Plaintiffs' claims for

16  excessive force in violation of the Fourth Amendment is granted.

17

18    **B.    Qualified Immunity — Individual Officers**

19

20    If a court finds, as it has here, that there is no

21  constitutional violation, the inquiry ends and the individual

22  Defendants are entitled to qualified immunity.  Nevertheless, out

23  of an abundance of caution, the Court will discuss whether, if

24  there indeed was a constitutional violation, the individual

25  Defendants are entitled to qualified immunity.

26  ///

27  ///

28  ///

1   Defendants contend that the individual officers are entitled
2   to qualified immunity because, based on the clearly established
3   law at the time of the incident, a reasonable officer, faced with
4   those circumstances, could have believed that the amount of force
5   employed was not unlawful.  Plaintiffs, conversely, maintain that
6   the individual officers are not entitled to qualified immunity
7   because, at the time of the incident, the law clearly established
8   that the officers were required to take Decedent's mental
9   impairment into account, and failed to do so.

10   Qualified immunity protects "government officials...from
11   liability for civil damages insofar as their conduct does not
12   violate clearly established statutory or constitutional rights of
13   which a reasonable person would have known."  Harlow v.
14   Fitzgerald, 457 U.S. 800, 818 (1982); Phillips v. Hust, 477 F.3d
15   1070, 1079 (9th Cir. 2007); Brittain v. Hansen, 451 F.3d 982, 987
16   (9th Cir. 2006).  The "concern of the immunity inquiry is to
17   acknowledge that reasonable mistakes can be made," and that it is
18   "often difficult for an officer to determine how the relevant
19   legal doctrine will apply to the factual situation that he
20   faces."  Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049
21   (9th Cir. 2002).
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

1    Courts generally engage in a two-part analysis[16] in

2    determining whether qualified immunity should apply.  See Saucier

3    v. Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of

4    Clackamas, 469 F.3d 1221, 1229 (9th Cir. 2006); Brittain,

5    451 F.3d at 987.  The initial inquiry requires the court to

6    determine whether, "taken in the light most favorable to the

7    party asserting the injury, do the facts show the officer's

8    conduct violated a constitutional right?"  Saucier, 533 U.S. at

9    201; Phillips, 477 F.3d at 1079; Skoog, 469 F.3d at 1229.  If the

10   answer is "no," then the calculus ends and the plaintiff cannot

11   prevail; if the answer is "yes," the court moves to the second

12   inquiry.  See Saucier, 533 U.S. at 201, 121 S. Ct. 2151;

13   Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007);

14   Johnson v. County of Los Angeles, 340 F.3d 787, 793-94 (9th Cir.

15   2003).

16   The second inquiry requires the court to ascertain "whether

17   the right was clearly established," applying an "objective but

18   fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th

19   Cir. 2007); see Saucier, 533 U.S. at 202, 121 S. Ct. 2151;

20   Brittain, 451 F.3d at 988.  The critical question is whether "the

21   contours of the right were sufficiently clear that a reasonable

22   official would understand that what he is doing violates the

23   right."  Saucier, 533 U.S. at 202; Phillips, 477 F.3d at 1079.

24   ///

25

26       [16] The Supreme Court recently held that courts are no longer
     required to engage in this two-step process.  Courts are now free
27   to "exercise their sound discretion in deciding which of the two
     prongs of the qualified immunity analysis should be addressed
28   first."  Person v. Callahan, 555 U.S. 223, 236 (2009).

1   If the officers had a reasonable, yet mistaken, belief that the
2   use of force was not contrary to clearly established law, the
3   officers are entitled to qualified immunity.  <u>See</u> <u>Saucier</u>,
4   533 U.S. at 205-06; <u>Skoog</u>, 469 F.3d at 1229; <u>Johnson</u>, 340 F.3d at
5   794.  Whether an officer could have a reasonable belief that the
6   conduct at question was lawful in accordance with clearly
7   established precedent is a question of law for the court to
8   determine.  <u>See</u> <u>Franklin v. Fox</u>, 312 F.3d 423, 437 (9th Cir.
9   2002); <u>LaLonde v. County of Riverside</u>, 204 F.3d 947, 953-954 (9th
10  Cir. 2000); <u>Neely v. Feinstein</u>, 50 F.3d 1502, 1509 (9th Cir.
11  1995); <u>Act Up!/Portland v. Bagley</u>, 988 F.2d 868, 873 (9th Cir.
12  1993).

13      In this case, the Court has already determined that the
14  officers' conduct did not violate Decedent's Fourth Amendment
15  rights, and thus, the individual Defendants are entitled to
16  qualified immunity.  <u>Saucier</u>, 533 U.S. at 201.  Even if, however,
17  there was a constitutional violation, the Court finds that a
18  reasonable officer, under the circumstances, could have believed
19  that their conduct did not violate clearly established law.

20      Specifically, Plaintiffs' contention that no reasonable
21  officer could have believed their conduct was lawful because the
22  law, at the time of the incident, clearly established that
23  officers must account for a suspect's mental instability, is
24  unavailing.  Indeed, as set forth above, there is precedent
25  holding that a suspect's mental instability militates toward a
26  finding that an officer's use of force was reasonable; there is
27  also precedent that a suspect's mental state weighs in favor of
28  finding an officer's use of force unreasonable.

28

1  Compare <u>Sanders</u>, 551 F. Supp. 2d at 1170; <u>Blanford</u>, 406 F.3d at
2  1116 <u>with</u> <u>Deorle</u>, 272 F.3d 1282-1283; <u>Drummond</u>, 343 F.3d at 1059.
3  Thus, at the time of the incident, the law was not so clearly
4  established that a reasonable officer could not have reasonably
5  believed that the use of force employed on this occasion, against
6  an armed, violent and mentally unstable individual, was lawful.

7      Based on the foregoing, the Court finds that the individual
8  officers are entitled to qualified immunity, and thus, the Court
9  grants summary judgment as to the individual officers.

10
11  **C.   Municipal Liability**
12

13      Defendants contend that there can be no municipality
14  liability because there was no constitutional violation.  Even
15  if, Defendants argue, there was a constitutional violation,
16  Plaintiffs have failed to proffer any evidence supporting their
17  claims under <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658
18  (1978).  Plaintiffs contend that the municipality is liable for
19  the officers' conduct because they "consciously failed to employ
20  reasonable and generally accepted police practices for dealing
21  with Plaintiff, someone they knew to be suffering from a mental
22  impairment, obviously acting irrationally and with diminished
23  capacity."  (Pl.'s Opp'n at 31:25-28.)  According to Plaintiffs,
24  the City failed to train the police in how to do deal with
25  mentally impaired individuals.  (<u>Id.</u> at 32:1-2.)  Once again,
26  Plaintiffs rest their claim on the fact that the officers were
27  dealing with a person acting under some sort of diminished
28  capacity.

29

A municipality may only be liable where it individually causes a constitutional violation via "execution of a government's policy or custom, whether by its lawmakers or by those whose edicts or acts may fairly be said to represent them. Monell, 436 U.S. at 694; Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).  In order to survive summary judgment, Plaintiffs must present evidence of either: "(1) a longstanding practice or custom which constitutes the "standard operating procedure" of a local government entity; (2) the decision of a policy-making official who was, as a matter of state law, a final policy making authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) when an official with final policy making authority either delegated that authority to, or ratified the decision of, a subordinate.  Meotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005).  Complete inadequacy of training may amount to a policy giving rise to Monell liability; however, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable.  City of Canon v. Harris, 489 U.S. 378, 379 (1989).

As a preliminary matter, the City of Folsom cannot be held liable for any Monell claims because the Court has found no constitutional violation occurred.  See Heller, 475 U.S. at 799 (holding that there can be no Monell liability in the absence of a constitutional violation).  Even assuming that the officers' use of force gave rise to a constitutional violation, Plaintiffs have failed to identify any basis for municipal liability.

Plaintiffs have pointed to no specific policy implemented or approved by the municipality; Plaintiffs have not shown any blameworthy conduct by ultimate decision-makers; Plaintiffs have failed to proffer evidence of any prior incident in which the Folsom police used excessive force; finally, and most importantly, Plaintiffs have failed to show that the training of Folsom police officers was inadequate.  Plaintiffs merely point to a singe incident conducted by individual officers with no influence on city-wide policy.  This single incident, however, is not sufficient to demonstrate a municipality policy or custom. See Smith, 551 F. Supp. 2d at 1179.  Plaintiffs have not met their burden of establishing Monell liability, and thus, summary judgment in favor of the City of Folsom is appropriate.

**D.   Plaintiffs' State Law Claims**

Defendants contend that Plaintiffs' state law claims fail because they are essentially corollary to Plaintiffs' federal claims.  Specifically, Defendants contend that each of Plaintiffs' state law claims must be analyzed under the same reasonableness standard used to analyze Plaintiffs' excessive force claim, and thus, in the absence of a finding of excessive force, summary judgment must be granted.  Plaintiffs admit that their negligence claims against the individual officers "flow from the same facts as the Fourth Amendment violation for excessive force and are measured by the same reasonableness standard of the Fourth Amendment violation for excessive force, and are measured by the same reasonableness standard of the Fourth Amendment.

(Pl.'s Opp'n at 32:7-10.)   Nevertheless, Plaintiffs submit that
Defendants are liable for negligent infliction of emotional
distress and for wrongful death.   Moreover, Plaintiffs contend
that the City has <u>respondeat superior</u> liability for the acts of
the officers because their use of force was unreasonable.
Finally, Plaintiffs claim that the individual Defendants are
liable for violation of California Civil Code § 52.1 because
Decedent's constitutional claims have passed to Decedent's
successor-in-interest.

"Federal civil rights claims of excessive force are the
federal counterpart to state battery and wrongful death claims;
in both, the Plaintiff must prove the unreasonableness of the
officer's conduct." <u>Munoz v. City of Union City</u>, 120 Cal. App.
4th 1077, 1002 N.6 (2004) (<u>citing</u> <u>Edson v. Anaheim</u>, 63 Cal. App.
4th 1269, 1274 (1998).)   Where "a federal court factually finds
that the police officers' conduct was objectively reasonable and
grants summary judgment, [that decision] bars a state negligence
action premised upon violation of the same primary right." <u>See</u>
<u>City of Simi Valley v. Superior Court</u>, 111 Cal. App. 4th. 1077,
1084 (2003) (discussing <u>res judicata</u> and primary rights).
"[W]here an employee is found not to have been negligent there
can be no vicarious liability." <u>Campbell v. Security Pac. Nat.</u>
<u>Bank</u>, 62 Cal. App. 3d. 379, 386 (1976).

Moreover, in order for Plaintiffs' state law negligent
hiring claim to survive summary judgment, they must "identify a
statute that impose[s] a duty for a public entity to 'non-
negligently' hire, select, and train employees,..." <u>Sanders</u>,
551 F. Supp. 2d at 1181.

1   Finally, in the absence of a viable federal constitutional claim,

2   plaintiffs cannot state a claim for violation of California Civil

3   Code § 52.1.  Simi Valley, 111 Cal. App. 4th at 1085; Reynolds v.

4   City of San Diego, 84 F.3d 1162, 1170-1171 (overturned on other

5   grounds Acri v. Varian Associates, Inc., 114 F.3d 999, 1001 (9th

6   Cir. 1997).

7        In this case, the lack of any constitutional violation is

8   fatal to Plaintiffs' state law claims.  The Court has found that

9   Defendants acted reasonably in the use of force deployed upon

10  Decedent, and thus, did not commit a constitutional violation.

11  Thus, Plaintiffs' claim for wrongful death against the individual

12  Defendants and the City fails as a matter of law.  Therefore,

13  Plaintiffs' claim that the City is liable on a theory of

14  vicarious liability also fails.  Since the Court has found that

15  there was no violation of Decedent's constitutional rights,

16  summary judgment in favor of Defendants is also appropriate as to

17  Plaintiffs' claim for violation of California Civil Code

18  § 52.1.  Moreover, Plaintiffs' claim for negligent hiring cannot

19  survive summary judgment because they have "failed to identify a

20  statute that impose[s] a duty for a public entity to 'non-

21  negligently' hire, select, and train employees,..." Sanders,

22  551 F. Supp. 2d at 1181.

23       Finally, Plaintiffs' claim for negligent infliction of

24  emotional distress is essentially a negligence action, and thus,

25  fails for the same reasons Plaintiffs' direct negligence/wrongful

26  death claim fails.

27  ///

28  ///

33

See Nancy Hersh & Ward Smith, California Civil Practice Torts § 1:49 (2011) ("A Cause of action for the negligent infliction of emotional distress is not an independent tort but the tort of negligence, and all the traditional elements of duty, breach of duty, causation, and damages apply.")

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.[17]

IT IS SO ORDERED.

Dated: November 8, 2011

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[17] Because oral argument will not be of material assistance, the Court orders these matters submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

34