1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11    YOUNG HAN, individually, and as            No.  2:10-cv-00633-MCE-GGH
      successor-in-interest to Decedent
12    JOSEPH HAN; NAM HAN; DAVID
      HAN,
13                                                **MEMORANDUM AND ORDER**
                       Plaintiffs,
14
             v.
15
      CITY OF FOLSOM, a municipal
16    corporation; SAMUEL L. SPIEGEL, in
      his capacity as Chief of Police for the
17    CITY OF FOLSOM; PAUL BARBER,
      individually and in his capacity as a
18    police officer for the CITY OF
      FOLSOM; DAREN PROCIW,
19    individually and in his official capacity
      as a police officer for the CITY OF
20    FOLSOM; RON PETERSON,
      individually and in his capacity as a
21    sergeant of police for the CITY OF
      FOLSOM, and DOES 1-25, inclusive,
22
                       Defendants.
23

24

25          Plaintiffs Young Han, Nam Han, and David Han ("Plaintiffs") are survivors of

26    Decedent Joseph Han ("Decedent").  In the present action, Plaintiffs allege state claims

27    for wrongful death and negligent infliction of emotional distress against the City of

28    Folsom ("City"), the City's Chief of Police ("Spiegel"), Officer Paul Barber ("Officer

                                             1

1   Barber"), Officer Daren Prociw ("Officer Prociw"), and Sergeant Ron Peterson ("Sergeant

2   Peterson") (collectively "Defendants").  The action arises from the shooting of Decedent

3   after Defendants responded to a call for service at the home of Decedent and Plaintiffs.

4   Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 37),

5   pursuant to Federal Rule of Civil Procedure 56, which Plaintiffs timely opposed (ECF

6   No. 42).  For the following reasons, Defendants' Motion is GRANTED.[1]

7

8                                    **BACKGROUND**[2]

9

10      On April 12, 2009, Plaintiffs Young and Nam Han (Decedent's parents) called 911

11  to request police assistance with their 23-year old son and possibly place him on a "5150

12  hold," a 72-hour hold pursuant to section 5150.2 of the Welfare and Institutions Code.[3]

13  Defendants Barber, Prociw, and Peterson responded to the call.  Plaintiffs informed the

14  officers that Decedent needed psychiatric help, was acting out of the ordinary, had

15  confined himself to his room and not eaten for days, claimed that he was God, and

16  would shout and curse at his friends and family members when they attempted to speak

17  to him in his room.  Additionally, Plaintiffs told the officers that Decedent had a 3 to

18

19      [1] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

20      [2] The following recitation of facts is taken, at times verbatim, from Plaintiffs' Opposition to

21  Defendants' Motion for Summary Judgment (ECF No. 42), Plaintiffs' Response to Defendant's Undisputed Facts (ECF No. 42-3), and Plaintiffs' complaint (ECF No. 1).  Because Plaintiffs oppose the entry of

22  summary judgment in Defendants' favor, the facts are construed in the light most favorable to Plaintiffs where there are factual disputes.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

23      [3] Section 5150 of the Welfare and Institutions Code states in pertinent part:

24          When any person, as a result of mental disorder, is a danger to others, or
            to himself or herself, or gravely disabled, a peace officer, member of the
25          attending staff, as defined by regulation, of an evaluation facility
            designated by the county, designated members of a mobile crisis team
26          provided by Section 5651.7, or other professional person designated by
            the county may, upon probable cause, take, or cause to be taken, the
27          person into custody and place him or her in a facility designated by the
            county and approved by the State Department of Mental Health as a
28          facility for 72-hour treatment and evaluation.

1   4-inch camping knife in his room, and that they did not know how he would respond to

2   police presence.  However, they related to the officers that Decedent was not suicidal

3   and had not threatened anyone.  Based on this information, the officers determined that

4   they could not force Decedent to go to the hospital, but they offered to talk with him.

5   Plaintiffs agreed to have the officers talk with him in his room, and Plaintiffs informed the

6   officers that no one else was inside the home.

7       Decedent's brother then led the officers to Decedent's bedroom door.  Officer

8   Barber arrived at the door first and found that it was closed but not locked.  After he

9   called out Decedent's first name and announced that they were the police, he opened

10  the door and stepped into the doorway.  At this point, both Decedent's brother and

11  Officer Barber saw Decedent holding a knife.  Decedent's brother recounts that when the

12  door was opened, Decedent was standing in front of his couch.  Decedent then moved

13  towards the door, where Officer Barber was standing, while yelling at the officers to get

14  out of his room.  After telling Decedent to drop the knife (UF ¶ 7), Officer Barber

15  discharged his Taser.  Decedent was not immobilized, presumably because only one

16  barb connected with Decedent.  At this point, Officer Barber drew his firearm and shot

17  Decedent.[4]  Officer Barber then retreated from the bedroom to the bathroom down the

18  hallway, and Decedent immediately closed the door.

19      Sergeant Peterson, the third officer on the scene, forced the door open with his

20  gun drawn.  Decedent had not moved from his position near the doorway (David Han

21  Dep., ECF No. 17-7, 7:2-10), and he continued to hold the knife.  Officer Prociw

22  deployed his Taser, and Decedent fell to the ground before standing back up still holding

23  the knife in his hand.  Sergeant Peterson told him to drop the knife at least twice, but

24  Decedent failed to drop the knife and moved toward Sergeant Peterson.  Sergeant

25  Peterson moved back and shot Decedent, and both of them fell into the hallway where

26  ///

27          [4] It is unclear if Officer Prociw deployed his Taser at this point, or if he deployed it once Sergeant
        Peterson entered Decedent's room.  However, the exact chronology of the second Taser is not relevant to
28      the Court's ruling.

1  the officers recovered the knife and handcuffed Decedent.  Decedent later died at the

2  hospital from the gunshot wounds.

3  Based on these facts, Plaintiffs brought federal and state claims against the City

4  of Folsom, the Folsom Chief of Police, and the individual officers.  Defendants

5  subsequently moved for summary judgment, and, on November 9, 2011, this Court

6  granted summary judgment in favor of Defendants on all of Plaintiffs' claims.  ECF

7  No. 24.  Plaintiffs appealed. On January 8, 2014, the Ninth Circuit upheld this Court's

8  ruling with the exception of Plaintiffs' state claims for wrongful death and negligent

9  infliction of emotional distress.  ECF No. 32.  In its ruling, the Ninth Circuit explained that,

10  based on the California Supreme Court's decision in Hayes v. County of San Diego,

11  305 P.2d 252 (Cal. 2013), "state negligence law . . . is broader than federal Fourth

12  Amendment law" and that law enforcement's preshooting tactics were relevant "under

13  California law in determining whether the use of deadly force gives rise to negligent

14  liability."  Id. at 263.  Because this Court analyzed the state claims under the same

15  standard as the federal claims, the Ninth Circuit reversed on the two state claims and

16  remanded back to this Court for further proceedings consistent with its decision.  As

17  such, the only claims before the Court are the state claims for wrongful death and

18  negligent infliction of emotional distress.  Defendants move for summary judgment on

19  Plaintiffs' remaining state law claims.  ECF No. 37.

20

21  **STANDARD**

22

23  The Federal Rules of Civil Procedure provide for summary judgment when "the

24  pleadings, depositions, answers to interrogatories, and admissions on file, together with

25  affidavits, if any, show that there is no genuine issue as to any material fact and that the

26  moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex

27  Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is

28  to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

4

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir.1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the

5

1  evidence is such that a reasonable jury could return a verdict for the nonmoving party."

2  <u>Anderson</u>, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary

3  question before the evidence is left to the jury of "not whether there is literally no

4  evidence, but whether there is any upon which a jury could properly proceed to find a

5  verdict for the party producing it, upon whom the onus of proof is imposed."  <u>Id.</u> at 251

6  (quoting <u>Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)).  As the Supreme Court

7  explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its

8  opponent must do more than simply show that there is some metaphysical doubt as to

9  the material facts."  <u>Matsushita</u>, 475 U.S. at 586.  Therefore, "[w]here the record taken as

10  a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

11  'genuine issue for trial.'"  <u>Id.</u>

12      In resolving a summary judgment motion, the evidence of the opposing party is to

13  be believed, and all reasonable inferences that may be drawn from the facts placed

14  before the court must be drawn in favor of the opposing party.  <u>Anderson</u>, 477 U.S. at

15  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

16  obligation to produce a factual predicate from which the inference may be drawn.

17  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>,

18  810 F.2d 898 (9th Cir. 1987).

19

20  **ANALYSIS**

21

22      Defendants contend that their conduct leading up to and including the use of

23  deadly force was reasonable and that there is no dispute of material fact as to Plaintiffs'

24  claims for wrongful death and intentional infliction of emotional distress.  Plaintiffs, on the

25  other hand, argue that Defendants' actions in approaching Decedent were unreasonable

26  and created the dangerous situation that resulted in the use of deadly force.  For the

27  following reasons, the Court finds that Defendants' behavior both before and at the time

28  of the shooting was reasonable as a matter of law.

1    The California Supreme Court "has long recognized that peace officers have a

2  duty to act reasonably when using deadly force."  Hayes v. Cnty. of San Diego,

3  57 Cal. 4th 622, 629 (2013). The cause of action is grounded in the tort of negligence

4  and the corresponding duty of police officers to act reasonably when using deadly force.

5  Id.  As the Court explained, "[t]he reasonableness of an officer's conduct is determined

6  in light of the totality of circumstances," which includes preshooting circumstances.  Id. at

7  629-30.  Those preshooting circumstances might show that an otherwise reasonable use

8  of deadly force was in fact unreasonable, such as where officers negligently provoke a

9  dangerous situation in which the subsequent use of deadly force was justified.  Id. at

10  630.

11    However, officers are afforded discretion in performing their duties.  As explained

12  by the California Supreme Court in Hayes:

13           [A]s long as an officer's conduct falls within the range of
            conduct that is reasonable under the circumstances, there is
14           no requirement that he or she choose the 'most reasonable'
            action or the conduct that is the least likely to cause harm
15           and at the same time the most likely to result in the
            successful apprehension of a violent suspect, in order to
16           avoid liability for negligence.

17  57 Cal. 4th at 632 (quoting Brown v. Ransweiler, 171 Cal. App. 4th 516, 537-38 (2009)).

18  Further, the California Supreme Court cautioned in Hayes that it was not suggesting that

19  "a particular preshooting protocol (such as a background check or consultation with

20  psychiatric experts) is always required."  57 Cal. 4th at 632.  "The 'reasonableness' of a

21  particular use of force must be judged from the perspective of a reasonable officer on

22  the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S.

23  386, 396 (1989).  "Summary judgment is appropriate when the trial court determines

24  that, viewing the facts most favorably to the plaintiff, no reasonable juror could find

25  negligence."  Id.

26    In its original decision on summary judgment, this Court held that the officers' use

27  of force at the time of the two shootings was reasonable as a matter of law (ECF No. 24

28  at 25, 33), and the Ninth Circuit affirmed that decision (ECF No. 32).   Thus, the key

1   question before the Court now is whether the officers acted reasonably in their

2   interactions with Decedent under the totality of the circumstances, including their actions

3   leading up to the use of deadly force.

4       In arguing that the officers' actions were unreasonable, Plaintiffs present the

5   expert testimony of Lou Reiter ("Reiter").  Reiter Dep., Ex. A, ECF No. 42-1.  Reiter

6   opined in his deposition that instead of entering Decedent's bedroom, the officers should

7   have positioned themselves somewhere outside of the bedroom, potentially down the

8   hallway or at the foot of the stairs on the first floor.  Id. at 9:5–11:4.  Reiter contends that

9   announcing themselves at a safe distance away from his bedroom would have given

10  them a tactical advantage and also allowed Decedent to identify himself and his location

11  rather than be surprised by the entrance of officers in his bedroom.  Id.  That positioning,

12  in Reiter's opinion, would have allowed the officers sufficient distance between

13  themselves and Decedent to have a dialogue "that [would have] defuse[d] any kind of

14  agitation [Decedent] might have [had]."  Id. at 10:4–9.

15      Reiter suggests that there were other tactical maneuvers or decisions that could

16  have been made in approaching Decedent's bedroom, but he concedes that it was

17  reasonable for the officers to enter the threshold of Decedent's bedroom to see whether

18  he was there.  Id. at 9:17–21.  Indeed, at that point, the officers had no advance

19  knowledge that the person on the other side of the bedroom door would be a threat to

20  their safety.  The officers' only information at the point of entry into the bedroom is that

21  Decedent had not been eating, had not come out of his room for several days, and had

22  been acting out of the ordinary.  Although the officers were told he had a knife in his

23  bedroom, they had no reason to believe that they would be confronted with violence on

24  the other end of Decedent's door because Decedent's family informed them that he was

25  not suicidal and had not threatened others.  Still, Plaintiffs dispute that the officers'

26  actions were reasonable and rely heavily on two cases to support their argument: Hayes

27  and Grudt v. City of Los Angeles, 2 Cal. 3d 575 (1970).  Both cases are distinguishable

28  from the present action.

1    In <u>Grudt</u>, the California Supreme Court held that it was improper for the trial court

2    to remove the issue of negligence from a jury in a deadly force case alleging wrongful

3    death under California law.  2 Cal. 3d at 587.  After seeing Grudt almost hit two women

4    in a crosswalk with his vehicle, two plainclothes officers in an unmarked vehicle decided

5    to stop Grudt for questioning.  <u>Id.</u> at 581.  Since they did not have police lights and sirens

6    in their unmarked vehicle, the officers drove beside Grudt's vehicle in an effort to get him

7    to pull over.  Instead of immediately stopping his vehicle, Grudt continued driving and

8    only pulled over once he was confronted at an intersection with another unmarked police

9    vehicle with two other plainclothes officers.  <u>Id.</u>  Then, one of the officers exited his

10   vehicle, loaded his double-barrel shogun, and tapped on the driver side window of

11   Grudt's car.  <u>Id.</u>  Upon seeing the officer "lift[] his shotgun in the air, lean[] forward and

12   point[] to his badge," Grudt allegedly started to drive away in the direction of another

13   officer standing in front of Grudt's vehicle.  <u>Id.</u> at 582.  Both officers immediately

14   discharged their weapons at Grudt, who died within seconds of the shooting.  <u>Id.</u>  The

15   California Supreme Court concluded that, even if a jury believed that Grudt was

16   accelerating at the time of the shooting, other evidence raised a genuine issue of

17   material fact as to whether the officers acted reasonably in their actions prior to the

18   shooting.  <u>Id.</u>  Specifically, the Court found that a jury could find that Grudt believed he

19   was being robbed and that the officers were negligent "when they originally decided to

20   apprehend Grudt, when they approached his vehicle with drawn weapons, and when

21   they shot him to death."  <u>Id.</u>

22   The present case bears little resemblance to <u>Grudt</u>.  Unlike <u>Grudt</u>, the officers in

23   this action announced themselves as police before ever drawing their weapons, and

24   they were all wearing their police uniforms.  Instead of approaching Decedent with guns

25   drawn, they attempted to converse with him, and even attempted to subdue him with

26   non-lethal force before resorting to shooting.  There is no plausible argument in the

27   present case that Decedent mistook the officers for robbers or that their actions were

28   overly aggressive as in <u>Grudt</u>.

1    The facts in Hayes, though slightly aligned with those of the present case, are

2    also distinguishable.  In Hayes, the Ninth Circuit reversed the district court's grant of

3    summary judgment in another deadly force case alleging wrongful death under California

4    law.  In Hayes, two officers responded to a domestic disturbance call at Hayes'

5    residence and were informed by his girlfriend that Hayes was suicidal but had not

6    harmed her or others.  Id. at 1227.  The officers decided to conduct a welfare check on

7    Hayes inside the house and entered the home with their guns holstered.  The Ninth

8    Circuit opinion details the circumstances leading up to the shooting of Hayes:

9    
10   Once in the living room, Deputy King saw Hayes in an
     adjacent kitchen area, approximately eight feet away from
     him. Because Hayes's right hand was behind his back when
11   Deputy King first saw him, Deputy King testified that he
     ordered Hayes to "show me his hands." While taking one to
12   two steps towards Deputy King, Hayes raised both his hands
     to approximately shoulder level, revealing a large knife
13   pointed tip down in his right hand. Believing that Hayes
     represented a threat to his safety, Deputy King immediately
14   drew his gun and fired two shots at Hayes, striking him while
     he stood roughly six to eight feet away. Deputy Geer
15   simultaneously pulled her gun as well, firing two additional
     rounds at Hayes.

16   Deputy King testified that only four seconds elapsed between
     the time he ordered Hayes to show his hands and the time
17   the first shot was fired. When asked why he believed Hayes
     was going to continue at him with the knife, Deputy King
18   testified: "Because he wasn't stopping." Neither deputy had
     ordered Hayes to stop. While stating that such a command
19   would have only taken "a split second," Deputy King testified
     that "I didn't believe I had any time."
20   

21   Id. at 1227–28.

22   In reversing summary judgment for the officers, the Ninth Circuit found that,

23   viewing the facts in the light most favorable to the plaintiff, Hayes appeared to be

24   complying with the officer's order to show his hands when he raised his hands and

25   revealed the knife.  Id. at 1233.  Furthermore, the undisputed fact that Hayes was

26   moving toward the officers with the knife in hand was not enough to find that the use of

27   deadly force was reasonable as a matter of law, especially since he was "still six to eight

28   ///

1   feet away from [the officer] at the time he was shot" and "had not been told to stop." <u>Id.</u>

2   at 1234.

3       There are several facts that distinguish the case at hand from <u>Hayes</u>.  Here,

4   Decedent approached the officers with the knife while yelling for them to get out of his

5   bedroom.  In contrast, Hayes made no such aggressive statements to the officers.  In

6   fact, Hayes's girlfriend alleged that Hayes told the officers: "You want to take me to jail or

7   you want to take me to prison, go ahead." <u>Id.</u> at 1228.  Additionally, unlike <u>Hayes</u>, the

8   officer in the present case exhausted various non-lethal uses of force prior to shooting:

9   Officer Barber told Decedent to put down the knife, and he used a Taser before resorting

10  to deadly force.  Finally, the distance between the officer and Decedent was constrained

11  in a small bedroom, while in <u>Hayes</u> there the officer and Hayes were separated in two

12  different rooms by at least six to eight feet.

13      Additionally, Plaintiffs' expert Reiter further takes issue with the fact that the

14  officers did not retreat from the bedroom after seeing Decedent with the knife.  Reiter

15  states that, after seeing Decedent with the knife, the officers should have "redeployed,

16  reassessed, and made additional options on how to handle this emotionally disturbed

17  person who had a knife and was acting irrationally."  <u>Id.</u> at 12:1-16.  However, "the fact

18  that an expert disagrees with the officer's action does not render the officer's action

19  unreasonable." <u>Reynolds v. Cnty. of San Diego</u>, 84 F.3d 1162, 1169 (9th Cir. 1996).

20  Moreover, Plaintiffs cannot avoid summary judgment "by simply producing an expert's

21  report that an officer's conduct leading up to a deadly confrontation was imprudent,

22  inappropriate, or even reckless." <u>Espinosa v. City & Cnty. of San Francisco</u>, 598 F.3d

23  528, 548 (9th Cir.  2010).

24      Reiter is critical of the officers' decision to stay and attempt to calm down

25  Decedent rather than retreating to the hallway.  But officers are not required to have

26  perfect 20/20 vision, and the officers' actions must be viewed "from the perspective of a

27  reasonable officer on the scene." <u>Graham</u>, 490 U.S. at 396.  Instead of retreating,

28  Officer Barber made the split-second decision to persuade Decedent to drop the knife.

1   Aside from Reiter's suppositions that other actions could have been taken, there is no

2   evidence that Officer Barber acted unreasonably in making the ultimate decision to stay.

3   See Lopez v. City of Los Angeles, 196 Cal. App. 4th 675, 720  (finding that an expert's

4   contrary opinion did not make officer's decision not to retreat unreasonable where there

5   was no evidence "from the perspective of a reasonable officer on the scene, retreat was

6   either required or desirable") (citation omitted).  Viewing the facts in the light most

7   favorable to Plaintiffs, the officers' actions were reasonable as a matter of law.

8         Next, once Officer Barber shot Decedent and Decedent closed the door behind

9   him, Plaintiffs argue it was unreasonable for Sergeant Peterson to kick down the closed

10  bedroom door and then take several steps into the room.[5]   Plaintiffs claim that there are

11  disputed issues of material fact regarding these actions that preclude summary

12  judgment.  First, they claim that the jury should determine whether it was reasonable for

13  Sergeant Peterson to compress Decedent's "zone of comfort" by entering his room with

14  a drawn firearm and precipitating the confrontational reaction.  ECF No. 42 at 13.

15  Plaintiffs support their argument with their expert's deposition testimony that there was

16  no reason the officers could not have waited outside the room and tried to talk to

17  Decedent from there before re-entering the room.  Reiter Depo., Ex. A, ECF No. 42-1, at

18  25:1-3.

19        As stated above, the fact that an expert considers alternative actions to be more

20  appropriate in hindsight does not render an officers' behavior unreasonable.  Reynolds,

21  84 F.3d at 1169.  That is particularly true in this case where the expert himself agrees

22  that at some point the officers were "going to have to get into the room" because they

23  needed to determine if Decedent "in fact was injured or not."  Reiter Depo. at 24:21-25:5.

24  Indeed, although the expert finds fault with the speed with which Sergeant Peterson

25  kicked in the door, he concedes that getting into Decedent's room had to occur

26  _____

          [5] Defendants claim that Sergeant Peterson kicked in Decedent's bedroom door because he
27  believed Officer Barber was trapped inside the room with Decedent.  However, because the Court must
    draw inferences from the facts in the light most favorable to Plaintiffs, the Court analyzes the reasonability
28  of Sergeant Peterson's entrance into the bedroom on its face rather than based on his alleged motives.
    See Matsushita, 475 U.S. at 587.

1   eventually to determine if Decedent required medical attention.  Id.  Next, the expert

2   states that rather than stepping into the bedroom to locate Decedent, Sergeant Peterson

3   should have repositioned himself outside the room from a more tactical vantage point

4   with the other officers.  Id.  Again, the expert may disagree with Sergeant Peterson's

5   decision, but his disagreement alone is not enough to find that the officers' conduct was

6   unreasonable at the time.   See Reynolds, 84 F.3d at 1169.

7        Finally, Plaintiffs argue that Defendants should have taken into consideration

8   Decedent's diminished mental capacity in their approach to the situation.  That argument

9   also fails as a matter of law.  Plaintiff's expert suggests that Defendants could have

10  slowed down and taken more time in contacting Decedent to account for his mental

11  instability.  However, other than this testimony, Plaintiffs offer no evidence or case law

12  that Defendants acted unreasonably in entering Decedent's bedroom: first by Officer

13  Barber to check on his well-being, and then by Sergeant Peterson in response to shots

14  being fired in the bedroom.  Furthermore, Defendants initially went into Decedent's

15  bedroom at the request of his family, and, at that point, even his own family was

16  unaware of the extent of his mental instability.  See David Han Depo. at 4:6-9 ("I didn't

17  know how he was really going to act right now because, like, before this all happened,

18  he would never have done anything like that.").  To request the officers to predict

19  Decedent's violent reaction to their presence in his bedroom would impermissibly require

20  them to have the "20/20 vision of hindsight."  See Graham, 490 U.S. at 396.

21       Based on the totality of the circumstances, as described above, no reasonable

22  juror could find that Defendants' preshooting conduct was unreasonable.  Thus,

23  Defendants are entitled to summary judgment as to Plaintiffs' wrongful death claim.

24  Additionally, because unreasonable conduct is an essential finding for negligence,

25  Plaintiffs' claim for negligent infliction of emotional distress similarly fails.  See Burgess v.

26  Superior Court, 2 Cal. 4th 1064, 1072 (1992) (stating that emotional distress is analyzed

27  as the tort of negligence).

28  ///

1    **CONCLUSION**

2

3        For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No.

4    37) is GRANTED.

5        IT IS SO ORDERED.

6    Dated:  April 28, 2015

7

8

9    _____
     MORRISON C. ENGLAND, JR, CHIEF JUDGE

10   UNITED STATES DISTRICT COURT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28